UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KRISTOPHER STAMM,

                         Plaintiff,                 5:17-CV-0579 (GTS/DEP)

v.

ONONDAGA COUNTY,

                         Defendant.
_____

APPEARANCES:                        OF COUNSEL:

OFFICE OF JAMES D. HARTT         JAMES D. HARTT, ESQ.
    Counsel for Plaintiff
70 Linden Oaks, 3rd Floor
Rochester, NY 14625

HON. ROBERT A. DURR               CAROL L. RHINEHART, ESQ.
Onondaga County Attorney            KAREN A. BLESKOSKI, ESQ.
    Counsel for Defendant             JOHN E. HEISLER, JR., ESQ.
421 Montgomery Street, 10th Floor
Syracuse, NY 13202

GLENN T. SUDDABY, Chief United States District Judge

## <u>DECISION and ORDER</u>

Currently before the Court, in this employment civil rights action filed by Kristopher

Stamm ("Plaintiff") against Onondaga County ("Defendant"), is Defendant's motion for

summary judgment.   (Dkt. No. 14.)   For the reasons set forth below, Defendant's motion is

granted.

## I.      RELEVANT BACKGROUND

### A.     Plaintiff's Complaint

Generally, liberally construed, Plaintiff's Complaint alleges, between approximately

September of 2015, and December 20, 2016, in Onondaga County, New York, Defendant, through its Department of Corrections, took adverse employment actions against, and knowingly permitted the severe and pervasive harassment of, Plaintiff, an Asian-American corrections officer, because of his race. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Generally, based on these factual allegations, Plaintiff asserts the following two claims against Defendant: (1) a claim that Defendant discriminated against him based on his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"); and (2) a claim that Defendant created a hostile work environment based on his race also in violation of Title VII. (*Id*.) Familiarity with these claims and the factual allegations supporting them in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id*.)

**B.     Statement of Undisputed Material Facts**

Before reciting the material facts of this case, the Court must address four general issues with regard to Plaintiff's response to Defendant's Statement of Undisputed Material Facts.

First, Plaintiff's "response" is procedurally improper in that (a) it is presented in his affidavit (which is not even complete or signed), and (b) a copy of it is alternatively presented in his opposition memorandum of law. A Rule 7.1 Response may not be presented in an affidavit.[1]

---

[1]      *See* N.D.N.Y. L.R. 7.1(a)(3) ("Each fact [in a Statement of Material Facts] shall set forth a specific citation to the record where the fact is established [not be contained in part of the record itself]."); *Cusamano v. Sobek*, 604 F. Supp.2d 416, 432 (N.D.N.Y. 2009) ("[Plaintiff's] . . . 40-page, 139-paragraph, single-spaced, handwritten document that attempted to serve as the following four things at the same time: (1) a partial Rule 7.1 Response (and counter-statement of facts); (2) a Rule 7.1 Statement of Material Facts (in support of Plaintiff's cross-motion for summary judgment); (3) a declaration; and (4) a document containing legal arguments (including ad hominem attacks on defense counsel). . . .   Such a document is in flagrant violation of numerous local rules. As a result, the document in question was, and is, properly disregarded by

Furthermore, a Rule 7.1 Response should be separate from an opposition memorandum of law.[2]

Second, in any event, in his response, Plaintiff refuses to expressly admit or deny numerous facts asserted by Defendant in its Rule 7.1 Statement. (*See, e.g.*, Dkt. No. 20, Attach. 1, at ¶¶ 39, 42, 43, 44, 45, 54, 59, 60, 61, 63, 65, 70, 71, 74, 75, 76, 79, 82, 83, 90, 105, 106, 117, 118 [Pl.'s Rule 7.1 Response].) This is impermissible,[3] even when it is based on a purported

---

the Court."); *Zimmerman v. Burge*, 06-CV-0176, 2008 WL 850677, at *14 n.64 (N.D.N.Y. March 28, 2008) ("I note that Plaintiff's attachment of a (self-serving) affirmation at the end of his Rule 7.1 Statement, pursuant to 28 U.S.C. § 1746, is not sufficient to transform the factual assertions therein into factual assertions supported by record citations, as required by Local Rule 7.1. . . . As an initial matter, Local Rule 7.1 implicitly makes a distinction between a Statement of Material Facts and the record. . . . Moreover, such a verification cannot serve as admissible evidence in the event of trial because it fails to demonstrate how the affiant is competent to testify to the facts he or she alleges . . . . Finally, such a verification cannot transform several of Plaintiff's factual assertions into evidence since they are devoid of necessary specifics.") (internal quotation marks and citations omitted).

[2]      *See Wright v. Goldman Sachs & Co.*, 387 F. Supp. 2d 314, 318 (S.D.N.Y. 2005) ("Although Goldman submitted a Rule 56.1 statement of undisputed facts as part of its motion papers, Wright did not submit a separate counterstatement of disputed facts as the Local Civil Rule requires. Moreover, contrary to the Rule, much of the discussion of facts in Wright's memorandum of law opposing summary judgment is bereft of citations to admissible evidence, and many of the citations which are given refer to documents that do not support Wright's factual assertions. For these reasons, the facts set forth in Goldman's Rule 56.1 statement must be deemed admitted."); *cf. Fox v. Lee*, 15-CV-0390, 2018 WL 1211111, at *8 (N.D.N.Y. Feb. 2, 2018) ("Plaintiff failed to submit a Statement of Material Facts in conjunction with his Motion for Summary Judgment; instead, his memorandum of law contains a 'Facts' section with numbered paragraphs."); N.D.N.Y. L.R. 7.1(a)(3) ("The opposing party shall file a [matching] response to the [independent] Statement of Material Facts.").

[3]      *See* N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. . . . <u>The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert</u>.") (emphasis in original); *In re Horowitz*, 14-CV-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) ("[A] response contending to neither admit or deny an allegation does not create a genuine issue of fact.").

lack of knowledge of the facts.[4]

Third, although Plaintiff expressly admits the entirety of numerous facts asserted by Defendant, he then follows those admissions with commentary for the Court's consideration. (*See, e.g.*, Dkt. No. 20, Attach. 1, at ¶¶ 3, 4, 5, 6, 8, 9, 10, 11, 12, 16, 17, 23, 24, 25, 26, 31, 52, 77, 107, 115 [Pl.'s Rule 7.1 Response].) This too is impermissible,[5] regardless of whether the commentary is intended to assert a related fact,[6] place in context or "spin" the asserted fact,[7] or

---

[4]    *See Percoco v. Lowe's Home Ctrs., LLC*, 208 F. Supp. 3d 437, 440 n.2 (D. Conn. 2016) ("Plaintiff, at various points, fails to admit or deny facts and instead states that she has 'no knowledge.' . . . The Court deems those facts admitted because 'no knowledge' is a noncognizable response."); *In re Horowitz*, 14-CV-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) ("On a motion for summary judgment, denials based on a lack of knowledge or information sufficient to form a belief are insufficient to contest a disputed fact . . . ."); *Davis v. City of Syracuse*, 12-CV-0276, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) ("On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge, mere information or belief, and/or inadmissible evidence are insufficient to create a genuine dispute."); *Eiden v. McCarthy,* 531 F. Supp. 2d 333, 337-38 (D. Conn. 2008) ("With regard to Paragraphs 17, 18, 76, 77, 80, and 81 of the Defendants' Local Rule 56(a)(1) Statement, the Plaintiff has responded 'Plaintiff has no knowledge.' Such a response, however, in not permitted under the Local Rules."); *N.Y.S. Teamsters Conference Pension and Ret. Fund v. Doren Ave. Assoc., Inc.*, 321 F. Supp. 2d 435, 438 (N.D.N.Y. 2004) ("Of the 45 paragraphs in the Fund's response to this statement, 21 are conclusory denials, 16 are denied for lack of sufficient information, and none are accompanied by a record citation. Thus, per Local Rule 7.1(a)(3), the factual allegations in defendants' statement of material facts may be deemed admitted.").

[5]    *See CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) ("[T]he Court will consider the statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed.'"); *Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) ("[T]he statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit.'").

[6]    *See Maioriello v. New York State Office for People With Developmental Disabilities*, 272 F. Supp. 3d 307, 311 (N.D.N.Y. 2017) ("[T]hroughout Plaintiff's Rule 7.1 Response, she 'admits' many of the facts asserted by Defendants in their Rule 7.1 Statement but then includes additional facts and/or legal argument in those responses. . . .   Where this occurs, the Court will deem those facts admitted and disregard the additional factual assertions and/or argument that Plaintiff provides in her responses."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 417 (S.D.N.Y. 2014) (holding that plaintiff's response to defendant's Rule 56.1 Statement failed to comply with the

4

deny a perceived *implication* of the asserted fact.[8]

Fourth, although Plaintiff's expressly denies, or partially denies, numerous facts asserted by Defendant in its Rule 7.1 Statement, he fails to cite record evidence in support of those denials. (*See, e.g.*, Dkt. No. 20, Attach. 1, at ¶¶ 7, 13, 14, 15, 18, 19, 21, 22, 27, 28, 29, 30, 49, 55, 56, 58, 62, 66, 69, 78, 80, 81, 84, 85, 86, 89, 91, 97, 101, 104, 109, 113 [Pl.'s Rule 7.1 Response].) This too is impermissible.[9]

Having said all of that, before Defendant's factual assertions may be deemed to have been "admitted" by Plaintiff pursuant to Local Rule 7.1(a)(3) of the Local Rules of Practice for this

---

rule because "counsel neither admits nor denies a particular fact, but instead responds with equivocal statements such as: 'Admit, but defendant omits the balance of plaintiff's testimony'").

[7]    *See Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make").

[8]    *See Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts).

[9]    *See* N.D.N.Y. L.R. 7.1(a)(3) ("Each denial shall set forth a specific citation to the record where the factual issues arises. <u>The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.</u>") (emphasis in original); *Suares v. Cityscape Tours, Inc.*, 603 F. App'x 16, 16 (2d Cir. 2015) ("Plaintiff's Local Rule 56.1 statement contained no record citations. . . .   The district court therefore acted within its discretion in denying plaintiff's motion."); *N.Y. Teamsters v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1[a][3] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1[a][3] statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations"); *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("[U]nsupported assertions [in a Local Rule 56.1 statement] must . . . be disregarded."); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules . . . [and] is not required to consider what the parties fail to point out in their Local Rule 56.1 statements . . . .") (internal quotation marks omitted).

Court, those factual assertions must be (1) supported by the record evidence to which Defendant has cited in its Rule 7.1 Statement, and (2) not contradicted by any record evidence that the Court has come across during its review of the record (in order to verify the accuracy of Defendant's citations in its Rule 7.1 Statement, and verify the accuracy of Plaintiff's citations in its Statement of Additional Material Facts in Dispute). The following factual assertions meet those requirements.

The Parties

1.      Kristopher Stamm (hereinafter "Plaintiff") is of Japanese descent because his father was Japanese. Plaintiff was hired by Commissioner Cowin of the Onondaga County Department of Correction on September 28, 2009, and became a permanent employee on September 26, 2010. Plaintiff holds the position of Correction Officer (hereinafter "CO").

2.      Before January 1, 2018, Defendant, Onondaga County (hereinafter the "County"), operated the Onondaga County Department of Correction, which had a facility in Jamesville, New York. On January 1, 2018, the Onondaga County Sheriff's Office took over control of the Department of Correction and it is now known as the Onondaga County Sheriff's Office Department of Correction (and it shall hereinafter be referred to as the "Department of Correction" or the "Department," and the facility shall be referred to as "Jamesville" or the "facility").

The County and the Department of Correction

3.      The County has policies and procedures that are applicable to all County employees, including those employed at the Department of Correction. Included in those policies and procedures are those addressing harassment, discrimination and retaliation, and work

rules and penalties. County employees are provided with a copy of the Onondaga County Employees Handbook during their orientation which contains statements regarding harassment, discrimination and retaliation, as well as work rules and penalties. Additionally, the policies and procedures regarding harassment, discrimination and retaliation are available to all County employees on the County intranet which is accessible to all County employees, as well as available through the County Department of Personnel.

4.　　The County has a zero-tolerance policy for harassment, discrimination and retaliation.[10]

5.　　The Department of Correction is a paramilitary organization with a chain of command structure from highest to lowest being Commissioner (now Chief Deputy of Correction) (hereinafter the "Commissioner"), Asst. Commissioner (now Special Assistants to the Chief Deputy of Correction) (hereinafter the "Asst. Commissioner"), Captain, Lieutenant, Sergeant, Senior Officer (hereinafter "SO") and Correction Officer (again, hereinafter "CO").

6.　　The Department of Correction has numerous directives covering all aspects of

---

[10] Although he admits this fact, Plaintiff asserts that the policy "is not enforced equally. It depends who you are." However, he does not support that assertion with a record citation. In an attempt to support similar assertions in his Statement of Additional Facts in Dispute, he cites evidence that the Court finds does not controvert the above-stated fact. For example, he cites evidence that "sometimes" an "older lieutenant who is African American" will have a "new black officer" replace a "more veteran staff member" on a night shift; however, that evidence does not establish that this happens when the "more veteran staff member" is non-black, or even that the favoritism is not based on "[h]ow friendly" the preferred officer is with the lieutenant. (Dkt. No. 14, Attach. 8, at 16-17 [pages "15" and "16" of Emm Depo. Tr.].)   In addition, he cites deposition testimony in which Corrections Officer Emm admitted that he in fact "couldn't tell" if racism against blacks is looked upon more harshly than is discrimination against Asians. (Dkt. No. 14, Attach. 8, at 16-17 [pages "15" and "16" of Emm Depo. Tr.].) In any event, even if racism against blacks were punished more severely than was harassment against Asians, that fact would not mean that the County did not punish all instances of harassment, discrimination and retaliation towards Asians.

Departmental functioning. Directives are revised frequently, and all directives are reviewed on a regular cycle by the Executive Staff, which includes the Commissioner, Assistant Commissioners and Captains, along with the Personnel Administrator.

7. All Department of Correction employees are issued a Policy and Procedure Directives Manual and are responsible for keeping them up to date during their first year. Upon successful completion of their probationary term (which is one year in duration), they turn in their Policy and Procedure Directives Manual. Departmental policies and procedures are all posted on the Department intranet. Employees are required by Directive to review the Department intranet each day for any updated policies.[11]

8. In addition to the County's policies and procedures regarding harassment, discrimination and retaliation, the Department of Correction has directives regarding the issues of harassment, discrimination and retaliation.

9. The Department of Correction has a zero-tolerance policy regarding discrimination, harassment and retaliation.[12]

---

[11] Plaintiff asserts that employees are "not given the time or allowed to review [the manual] on a daily basis." However, he does not support that assertion with a record citation. In an attempt to support a similar assertion in his Statement of Additional Facts in Dispute, he cites evidence that the Court finds does not controvert the above-stated fact. Specifically, he cites his own deposition testimony in which he states that, in his experience, it is "*hardly ever* that we get a chance to get on" the computer by which they could access the policies, and that "we have to *ask permission* probably to get into a certain area where we can get access to a computer [during a break]." (Dkt. No. 14, Attach. 7, at 31 [attaching page "30" of Plf.'s Depo. Tr.] [emphasis added].) The Court does not find such obstacles to constitute a denial of access, nor does the Court find that Defendants' factual assertion expressly states that employees had unfettered access.

[12] Although he admits this fact, Plaintiff asserts that the policy is "not enforced." However, he does not support that assertion with a record citation. In an attempt to support other assertions in his Statement of Additional Facts in Dispute, he cites evidence that the Court finds does not controvert the above-stated fact. For example, he cites evidence that a co-worker once wrote an

10.     Every officer and civilian employee at the Department of Correction has mandatory annual training that includes training regarding harassment and discrimination.

11.     The Department of Correction has a Directive setting forth the Department's Codes of Ethics and Conduct for all Departmental employees, including directives concerning the treatment of staff and others, refraining from conflicts of interest, refraining from relationships which may appear to impair their ability to perform their duties, reporting violations of the socialization policy, and refraining from harassing, and discriminating against, staff and others.[13]

---

objectively non-racial statement in dirt on Plaintiff's truck, which incident was reported to and investigated by supervisors, and resulted in the punishment of the offender, the payment of compensation for any damage to Plaintiff's vehicle and an opportunity for Plaintiff to press criminal charges. (Dkt. No. 14, Attach. 7, at 58-62 [attaching pages "57" through "61" of Plf.'s Depo. Tr.]; Dkt. No. 14, Attach. 36, at 2-4 [attaching letter of complaint and investigative report]; Dkt. No. 14, Attach. 36, at 9 [attaching photos of truck].) He cites evidence that "jokes . . . were constantly thrown to [him]" since 2009, but he admits that he never complained about the jokes to superiors. (Dkt. No. 14, Attach. 7, at 63-65 [attaching pages "62" through "64" of Plf.'s Depo. Tr.].) He cites evidence that he was called "gook" and "zipperhead" at an unspecified or times by an unidentified individual or individuals; but that evidence does not establish that supervisors ever knew about the slurs. (Dkt. No. 14, Attach. 7, at 168 [attaching page "167" of Plf.'s Depo. Tr.]; Dkt. No. 14, Attach. 68, at 5 [Plf.'s Response to Interrog. No. 5]; Dkt. No. 14, Attach. 36, at 9 [attaching photos of truck].) He cites evidence that a corrections officer recalls at some point hearing "[s]ome Asian jokes"; but that evidence does not establish that any supervisors knew of those jokes.   (Dkt. No. 14, Attach. 9, at 11-12 [attaching pages "10" and "11" of Tineo Depo. Tr.].) Finally, he cites evidence that, after he complained of being "harassed" for non-racial reasons (specifically, for "screw[ing] up the count"), a co-worker said, "Well, he's a pretty big guy. He should be able to take all that." (Dkt. No. 14, Attach. 7, at 71 [attaching page "70" of Plf.'s Depo. Tr.].)

[13]     Although he admits this fact, Plaintiff asserts that the policy "is not enforced or organized. Different rules apply to different people." However, he does not support that assertion with a record citation. In an attempt to support similar assertions in his Statement of Additional Facts in Dispute, he cites evidence that that the Court finds does not controvert the above-stated fact. For example, he cites (1) evidence that "sometimes" a "new black officer" is favored over "a more veteran staff member" during a night shift, (2) evidence that Corrections Officer Emm "couldn't tell" if racism against blacks is looked upon more harshly than is discrimination against Asians, and (3) evidence that evidence that since 2009 "jokes . . . were constantly thrown to

12.     The Department of Correction has a strict Socialization Directive that prohibits social relationships between Department staff and inmates. Additionally, the Directive prohibits, in part, Department employees from knowingly engaging in any conversations, communications, or relationships, etc., with any inmate, former inmate, probationer, former probationer, parolee or former parolee in any manner or form which is not necessary or proper for the discharge of the employee's duties unless otherwise authorized by the Commissioner. The policy requires a Department employee to report any such contact or relationships as soon as possible, in writing, to the Security Captain through the chain-of-command. Violations of the policy will result in disciplinary action up to and including discharge.[14]

13.     All Department of Correction employees receive yearly in-service training regarding the requirements of the Socialization Directive. The in-service training includes a

---

[him]." (Dkt. No. 14, Attach. 8, at 16-17 [pages "15" and "16" of Emm Depo. Tr.].) This evidence was found to be inapposite earlier. *See, supra,* notes 8 and 10 of this Decision and Order.

[14]     Although he admits this fact, Plaintiff asserts that the directive "is not applied across the board for everyone. Different rules apply to different people." However, he does not support that assertion with a record citation. In an attempt to support similar assertions in his Statement of Additional Facts in Dispute, he cites evidence that that the Court finds does not controvert the above-stated fact. For example, he cites his own deposition testimony regarding five examples of violations of the Socialization Policy that supposedly were dealt with less harshly: (1) one instance in which a corrections officer had a platonic "friend" who was a former parolee, resulting in no punishment; (2) one instance in which a corrections officer leased residential properties to several former inmates, resulting in no punishment; (3) one instance in which a corrections officer married someone (apparently a fellow employee) before leaving her employment, and the "facility did nothing to her"; (4) one instance in which a corrections officer who had a "best friend from high school" who was a former parolee, resulting in no punishment; and (5) one instance in which a corrections officer played on a kickball team with a former inmate, resulting in punishment.   (Dkt. No. 14, Attach. 7, at 110-13 [attaching pages "109" through "112" of Plf.'s Depo.].) However, in addition to the fact this testimony is largely based on hearsay, none of the asserted violations involved a current corrections officer living with and dating a current probationer: objectively a more serious violation. (*Id.*) As a result, the non-punishment of those five violations does not render the Socialization Directive non-strict.

complete read through and review of the entire Directive.[15]

14.     The Department of Correction has a Directive concerning employees engaging in secondary employment. The Directive sets forth the policies and procedures for staff seeking permission to engage in secondary employment outside of their duties as Department employees, and specifies, in part, that staff who are out sick, on sick leave, on restricted duty or disabled shall not engage in secondary employment.[16]

15.     The Department of Correction has a Directive for Inmate Counts that sets forth the Department's policies, guidelines and procedures for ensuring the accountability of all inmates. The policy requires, in part, that each count be made promptly and accurately, that during a watch change both the incoming and outgoing officers will conduct the count together and shall both sign off on the count, and it further states that outgoing staff shall not be relieved of duty or leave the facility until the count is verified.[17]

---

[15]     Although he denies this fact, Plaintiff does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute. Although Plaintiff does assert in his deposition transcript that this training is "cram[med]" into an eight-hour training period, that assertion does not controvert the above-stated fact. (Dkt. No. 14, Attach. 7, at 38-39 [attaching pages "37" and "38" of Plf.'s Depo. Tr.].)

[16]     Although he denies this fact, Plaintiff does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute. Although Plaintiff does assert in his deposition transcript that he thinks the enforcement of this directive is a "gray area," that assertion does not controvert the existence of the directive. (Dkt. No. 14, Attach. 7, at 47-49 [attaching pages "48" and "49" of Plf.'s Depo. Tr.].)

[17]     Although he denies this fact, Plaintiff does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute. Although Plaintiff does assert in his deposition transcript that the directive is not always "follow[ed] . . . to a T" because of a "shortage of staff," that assertion does not controvert the existence of the directive. (Dkt. No. 14, Attach. 7, at 122-23 [attaching pages "121" and "122" of Plf.'s Depo. Tr.].)

16.     The Personnel Advisory Committee (hereinafter "PAC") is comprised of the Assistant Commissioners, the Captains and Personnel Administrator Romeo (hereinafter "Romeo"). PAC reviews the reports of incidents involving personnel and makes recommendations to the Commissioner regarding discipline. The Commissioner then decides what discipline, if any, should be imposed.[18]

17.     In September and October 2010, several officers filed grievances concerning the Department's decision to stop allowing officers who were on vacation for one shift work overtime for another shift in the same day. In June 2011, an agreement was reached with the Union that stipulated that, if an officer was on approved leave and overtime was needed on that same day, the officer would be skipped for the first canvass of the voluntary overtime list, and would be offered voluntary overtime for that same work day only after the remainder of the voluntary overtime list was exhausted. To date, this stipulated policy is still in effect.[19]

18.     Prior to June 20, 2012, Department of Correction staff were permitted to convert overtime hours into comp time hours rather than being paid for those hours. Due to a Departmental-wide overuse of this ability to convert, on June 6, 2012, Commissioner Cowin

---

[18]     Although he admits this fact, Plaintiff asserts that "it is not enforced equally due to favoritism." However, he does specify what "it" is, nor does he support the assertion with a record citation. Nor can the Court find a citation to such an assertion in Plaintiff's Statement of Additional Facts in Dispute.

[19]     Although he admits this fact, Plaintiff asserts, "[I]t is not enforced. Plaintiff was denied OT on several occasions when other officers were allowed." However, he does not support the assertion with a record citation. Nor can the Court find a citation to such an assertion in Plaintiff's Statement of Additional Facts in Dispute. Although Plaintiff does assert in his deposition transcript that Mike Romeo was "not letting [Plaintiff] work whatever overtime" he liked, that assertion does not controvert the existence of the stipulated policy. (Dkt. No. 14, Attach. 7, at 167 [attaching pages "166" of Plf.'s Depo. Tr.].)

issued a memorandum to all staff advising that effective, June 20, 2012, no authorization would be given for overtime hours to be converted to comp time, and instead, overtime hours would be monetarily compensated. Plaintiff admits that the memo regarding overtime being paid in cash, rather than being converted to comp time, is posted on the intranet, and that the reason the change was made was that everyone was abusing the conversion to comp time.[20]

19.     Before 2017, firearms training for officers occurred only in April and/or May of each year. Approximately 60% of officers were firearms qualified in any given year. In 2016, the only officers to receive firearms training outside of the April/May window were those officers who were newly hired on September 19, 2016.[21]

20.     Firearms are not permitted within the confines of the facility. The Response Team is not issued firearms, and members are not required to be weapons qualified. Firearms are only issued to qualified staff for the purposes of Transport, Perimeter Security, Arsenal Maintenance, Front Lobby Security, and Firearms Training and Qualification, or for purposes authorized by the Commissioner or Asst. Commissioner for Security and Operations.

21.     Before 2017, not being firearms qualified did not affect a staff member's ability to earn overtime. If overtime was required for a duty that required firearms qualification and a staff member seeking (or being ordered) to work overtime was not firearms qualified, the staff member would be assigned to an area that did not require a firearms qualified staff member and a

---

[20]     Although he denies this fact, Plaintiff does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

[21]     Although he denies this fact, Plaintiff does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

firearms qualified staff member would perform the duty requiring firearms qualification.[22]

22. The Department of Correction has a Directive regarding the Response Team. The Directive requires, in part, that Response Team members "consistently display a professional attitude toward staff and inmates." Additionally, there exists a Response Team Review Board which reviews the actions of Response Team members, and makes decisions regarding the removal of members.[23]

Plaintiff's Relevant Employment History

23. Plaintiff was hired by Commissioner Cowin as a Permanent Correction Officer Trainee at Jamesville Correctional effective September 28, 2009. On that date, Plaintiff acknowledged receiving the County Employees Handbook, including work rules and harassment policies, and a copy of the harassment policy that was explained to him. On December 21, 2009, Plaintiff signed acknowledgments that he had received copies of certain policy and procedure Department directives, including the Code of Ethics and Conduct, Employee Rights, Socialization, and Harassment, Discrimination and Anti-Retaliation. Additionally, Plaintiff signed a separate acknowledgment concerning the Socialization Directive, stating that he fully understood the policy, and that he would not engage in any conversation, communication, dealing, transaction, association or relationship with any inmate, former inmate, probationer,

---

[22] Although he denies this fact, Plaintiff does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute. Although Plaintiff does assert in his deposition transcript that on some occasions he could not work the overtime he wanted, that assertion does not controvert the above-stated fact. (Dkt. No. 14, Attach. 7, at 26, 167, 178 [attaching pages "25," "166" and "177" of Plf.'s Depo. Tr.].)

[23] Although he denies this fact, Plaintiff does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

former probationer, parolee, former parolee, or any visitor friend or relative of same. Commissioner Cowin changed Plaintiff's job status from probationary to permanent, effective September 26, 2010.

24.     Plaintiff admits that he attended County employee orientation where he received a copy of the County Employee Handbook and the County harassment policy. Plaintiff further admits that he was aware of, and did review, the Onondaga County Internal Discrimination / Harassment and Anti-Retaliation Policy before 2015, and that he was aware of the Onondaga County Employee Harassment and Discrimination Complaint Form before 2013. Plaintiff also admits to having received the copies of the Department of Correction policies on December 21, 2009, and to acknowledging that he had read and understood those policies.

25.     Plaintiff admits to having had access, during "downtime," to the policies of the Department of Correction through the computers at work, and that he could also ask to see copies Of policies.

26.     On May 13, 2012, Plaintiff submitted an Understanding of Employment Agreement for his outside work as a self-employed contractor doing business under the name of KMS Contracting. By nemo dated May 14, 2012, Assistant Commissioner Blume approved Plaintiff's secondary employment as a self-employed contractor.

27.     Plaintiff admits that "everybody" (except himself) "participates" in "roast[ing] somebody" in "staff dining," that he was "not the only individual [at the correctional facility] that [everybody] may pick on for various reasons," that "it's [the] norm" there, and that it is "the nature of the facility."[24]

_____

[24]     (*Compare* Dkt. No. 14, Attach. 4, at ¶ 27 [Def.'s Rule 7.1 Statement, citing page 63 of

28.     CO Emm ("Emm") believes that jokes may have been made by other officers about Plaintiff's Japanese heritage, but CO Emm has never witnessed any such jokes being made. Emm believes that those jokes may have been made because officers work under stressful conditions, so they get through the conditions by making fun of one another. Emm believes that such jokes are not made with malicious or evil intent, and that they are just jokes. Emm has never heard another officer refer to Plaintiff as a "gook." Emm has never made Japanese jokes.[25]

29.     CO Tineo ("Tineo") is of Hispanic descent. Tineo and Plaintiff would tease Each other about their respective nationalities. Tineo has never heard Plaintiff referred to as a "gook" (although, as of the date of his deposition, May 8, 2018, he "wouldn't be surprised" if someone had done so); and he does not have a specific memory of "racially insensitive" remarks being made by others about Plaintiff's Asian heritage other than a general memory of such remarks being made to Plaintiff by "some other people" (which Tineo does not know "if [Plaintiff] was okay with") during Tineo's and Plaintiff's mutual teasing in the "break room."[26]

---

Plf.'s Deposition Tr., which, along with page 62, establishes the above-stated fact] *with* Dkt. No. 40, Attach. 1, at ¶ 27 [Plf.'s Rule 7.1 Response, denying Defendant's factual assertion but failing to provide a record cite in support of that denial].)

[25]     Although he denies this fact, Plaintiff does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute. Granted, Plaintiff does assert in his deposition transcript that (1) Emm was among the officers who were "making jokes" at him or "roast[ing]" him, and (2) Emm drew penises in the snow and/or dirt on his truck. (Dkt. No. 14, Attach. 7, at 59, 63 [attaching pages "58" and "62" of Plf.'s Depo. Tr.].) However, Plaintiff nowhere asserts that the "jokes," which were made to "everybody" were racial in nature (much less were made by Emm); nor does Plaintiff deny the fact that the images of penises, which were accompanied by the words "learn how to park," immediately followed his having (inadvertently) parked his truck in *two* parking spaces. (*Id*. at 55, 63-64 [attaching pages "54," "62" and "63"]; Dkt. No. 14, Attach. 36, at 2-5 [attaching complaint and report]; Dkt. No. 14, Attach. 3, at ¶ 23 [Romeo Affid.]; Dkt. No. 14, Attach. 8, at 23 [attaching page "22" of Emm. Depo. Tr.].) Simply stated, this evidence does not controvert CO Emm's deposition testimony that he never made Japanese jokes.

30.     After Plaintiff was "roast[ed]" in "staff dining," he did not make complaints about the "roast[ing]" because sergeants and lieutenants were present at the time and thus Plaintiff did not know to whom to complain.[27]

31.     Plaintiff admits that his real complaint is not about what is being said, but about what he perceives to be different treatment through harsher penalties enforced against him partially as a result of his Japanese descent.

The Truck Incident

32.     On February 7, 2014, as Plaintiff was leaving work for the day, he noticed that someone had drawn pictures of penises and written sayings in the dirt on his truck. After walking around the truck, Plaintiff became angry and went to Department of Correction Human Resources and spoke to Administrator Romeo about the incident. Romeo contacted Sgt. Frink who went out and took pictures of the truck.

33.     In addition to the drawings of large penises on the truck, the words "learn how to

---

[26]     Although Plaintiff fails to support his denial that Tineo never heard Plaintiff called racially insensitive things, the Court has come across, and will not turn a blind eye to, the portion of Tineo's deposition transcript in which he admits his general recollection that "some other people" "intervened" in Tineo's and Plaintiff's mutual racial banter in the break room "and said stuff," which Tineo did not know "if [Plaintiff] was okay with." (Dkt. No. 14, Attach. 9, at 9-10 [attaching pages "8" and "9" of Tineo's Depo. Tr.].) As a result, the Court has amended Paragraph 29 of Defendant's Rule 7.1 Statement accordingly.

[27]     The Court has amended Paragraph 30 of Defendant's Rule 7.1 to more reflect the portion of the record cited. (Dkt. No. 14, Attach. 7, at 63-64 [attaching pages "62" and "63" of Plf.'s Depo. Tr.].) Although Plaintiff denies the fact asserted by Defendants, he does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute. While Plaintiff asserts in his deposition transcript two other instance of what he characterizes as "racial" harassment (one in which Assistant Commissioner Heisler described Plaintiff's standards as "down here right now," and one in which Officer Cifaratta called him a "pretty big guy" who "should be able to take it"), neither of those instances can rationally be characterized as racial in nature.

park," "fuck off," and "honk if you like dick too" done in pictograms were written on the truck.

34.     After the pictures were taken, Plaintiff drove his truck to Delta Sonic to have the drawings washed off his truck. Delta Sonic noticed scratches in the paint where the drawings were located.

35.     The matter was referred to Internal Affairs Lt. Kearney for investigation. On February 8, 2014, Plaintiff submitted a report to Lt. Kearney indicating that CO Emm had made a comment to him on February 7, 2014, about his parking, and that his truck had damage that would cost Plaintiff $91.79 to repair. On February 9, 2014, Lt. Kearney asked Plaintiff if he had any more information concerning the day the truck was written on and Plaintiff advised Kearney that Emm would admit to doing the drawings if he was questioned. Plaintiff submitted a report to Kearney regarding same. Plaintiff also indicated that he would be satisfied and not pursue the matter any further if Emm would reimburse Plaintiff the $91.79.

36.     Plaintiff admits that it was his own decision not to press charges because he did not want to see a friend or co-worker arrested despite the Department Administration wanting Plaintiff to press criminal charges against Emm.

37.     On February 12, 2014, Plaintiff reiterated that he merely wanted reimbursement for the cost of repairs to his truck, and that he did not want to pursue charges.

38.     On February 12, 2014, Emm admitted to having drawn on Plaintiff's vehicle, and that it was done as a joke. Emm was trying to be funny when he wrote on Plaintiff's truck. They were friends. Emm was telling Plaintiff that he parked like a "dick."

39.     By memo dated February 14, 2014, Lt. Kearney advised PAC of his investigation into the incident and the findings of the investigation.

40. Emm reimbursed Plaintiff the $91.79 for the cost of the repairs to his truck.

41. At no time before this litigation did Plaintiff indicate that he believed the drawings or the aforementioned incident (in general) to be racially motivated, nor did Plaintiff ever allege racial discrimination or racial harassment because of the incident.[28]

42. On February 20, 2014, PAC reviewed the information received from Lt. Kearney concerning Emm and the incident with Plaintiff's truck. PAC made a recommendation to Commissioner Cowin that Emm should be served with a Notice of Charges for a one-day suspension, and noted that Emm had reimbursed Plaintiff the $91.79. Commissioner Cowin made the determination to serve Emm with a Notice of Charges with a one-day suspension without pay.

43. On April 18, 2014, Emm was served with a Notice of Charges for the February 7th incident with Plaintiff's truck with a penalty of a one-day suspension without pay. Thereafter, the Department was served with a Grievance Form, and the matter proceeded to a Step Two hearing on June 12, 2014.

44. On June 12, 2014, a Step Two hearing was held on Emm's discipline. During the hearing, Onondaga County Employee Relations Officer Cifaratta (hereinafter "Cifaratta") noted that Emm had initially denied the conduct when interviewed by the Department of Correction, but had admitted to the conduct after speaking to his Union representative. Cifaratta also noted that Emm had agreed to reimburse Plaintiff for the repairs to the vehicle. Emm advised that, if Plaintiff had chosen to seek criminal charges for the damage, Emm's career with the Department

---

[28] Although he denies this fact, Plaintiff does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

of Correction would have been jeopardized. Emm also advised that he did not intend to cause damage to Plaintiff's vehicle.

45. By Notice of Step Two Decision dated June 17, 2014, Employee Relations Officer Cifaratta decided that the matter should be considered a "teachable moment" and reduced the penalty to a Written Reprimand.

46. Plaintiff admits that he does not know whether Emm was disciplined as a result of drawing on Plaintiff's truck, and that he would not normally be told that information.

47. Unless told by the involved employee, officers at the Department of Correction have no knowledge of the disciplinary history of any other officer.

<u>The First Termination</u>

48. In May/June 2015, Plaintiff began dating a woman who moved in with him in June 2015.

49. In mid-June 2015, Plaintiff learned that the woman whom he was dating was on probation. Plaintiff did not advise the Department of Correction that he was involved in a personal relationship with a probationer until approached by the Department of Correction.[29]

50. Plaintiff admits that he signed the acknowledgment indicating that he fully understood the Socialization policy in 2009, and that the Socialization Directive included people on probation.[30]

51. On July 8, 2015, Plaintiff called in sick for two days, and continued to do so for

---

[29]  Although he denies this fact, Plaintiff does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

[30]  Although he partially denies this fact, Plaintiff does not support that partial denial with a record citation. Nor can the Court find a citation to such a partial denial in Plaintiff's Statement

the next several days. Ultimately, Plaintiff provided doctor's notes which kept him out of work until August 28, 2015.

52.     On July 29, 2015, during a telephone call from Plaintiff to advise the Department that he would be out until August 28, 2015, Romeo informed Plaintiff that he was not to be working his secondary employment if he was unable to work at the Department of Correction. Plaintiff admits that he assured Romeo that he was not working his secondary employment.

53.     Plaintiff admits that he was aware that the secondary employment policy included a term that he was to do none of his secondary employment while out on sick leave from the Department of Correction, and Plaintiff admits that when Romeo orally advised Plaintiff that he was not to engage in his secondary employment he understood those directions.

54.     On August 4, 2015, the Department of Correction received information that Plaintiff was involved in a personal relationship with a female who was on probation with the Onondaga County Probation Department. Additionally, the Department learned that Plaintiff might be working his secondary employment while out on extended medical leave. Because these allegations would be clear violations of the Department's Socialization Directive and Secondary Employment Directive, the matter was referred to Internal Affairs Lt. Kearney for investigation.

55.     During the course of the investigation, Lt. Kearney learned that Plaintiff was living with the female probationer, that she was to be on probation until October 2016, and that Plaintiff had spoken to her probation officer on, at least, two occasions in June 2015 to express concerns he had about the probationer. Plaintiff never notified the Department, as he was required to do so pursuant to the socialization policy, that he was in a personal relationship with a

of Additional Facts in Dispute.

probationer.[31]

56.     Plaintiff admits that he did have contact with the probation officer of the woman whom he had been dating when he learned the woman was on probation.[32]

57.     Plaintiff physically returned to work on August 30, 2015, as August 28, 2015, and August 29, 2019, were his pass days (days off).

58.     On September 2, 2015, Lt. Kearney interviewed Plaintiff regarding the allegations that had been made. Plaintiff admitted to living with the probationer, whom Plaintiff identified as his fiancée (although their relationship was on-and-off). Plaintiff stated that he was not initially aware that she was on probation, but admitted that he did learn of her probation status in the second week of June and that he had contacted her probation officer. Plaintiff stated that he did not notify the Department per the socialization policy because he was out of work at the time. When it was pointed out that he was still required to report the relationship, and that he had been back to work for a few days, Plaintiff stated he did not understand the policy and did not know he could not live with someone on probation. Plaintiff also admitted that he had engaged in activities for his secondary employment (monitoring jobs for progress and safety for about four hours per week), while he was on medical leave from the Department of Correction.[33]

---

[31]     Although he denies this fact, Plaintiff does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

[32]     Although he denies this fact, Plaintiff does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

[33]     Although he partially denies this fact, Plaintiff does not support that partial denial with a record citation. Nor can the Court find a citation to such a partial denial in Plaintiff's Statement of Additional Facts in Dispute.

59.     By memo dated September 3, 2015, Lt Kearney submitted his investigation findings, and the statements that were taken, to Commissioner Cowin and Capt. Brush.

60.     At a meeting, on or about September 10, 2015, PAC reviewed the reports submitted by Lt. Kearney concerning his investigation into Plaintiff's alleged violations of the socialization and secondary employment policies. PAC recommended to Commissioner Cowin that Plaintiff be served with a Notice of Charges with the penalty of termination due to his clear violations of the Socialization and Secondary Employment Directives.

61.     On September 15, 2015, Plaintiff arrived late for his shift because his fiancée had been arrested for a violation of probation, and was being held at the Onondaga County Justice Center. Plaintiff had gone to visit his fiancée at the Justice Center and to arrange for her to have an attorney. Plaintiff then went to his fiancée's arraignment. Plaintiff submitted a report dated September 15, 2015, explaining why he was late for his shift.

62.     The Onondaga County Probation Department notified the Department of Correction that Plaintiff's fiancée had driven his vehicle to her probation appointment, despite not having a valid driver's license. The Probation Department further told the Department of Correction that Plaintiff was aware that his fiancée did not possess a valid driver's license.[34]

63.     On September 17, 2015, the name of Plaintiff's fiancée appeared on a list of inmates being transferred from the Justice Center to the Department of Correction. Because of Plaintiff's relationship with the inmate, Security Capt. Brush contacted the Justice Center and

---

[34]     Although he denies this fact, Plaintiff does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute. The Court notes that whether or not Plaintiff's vehicle was taken without his acknowledgment is immaterial to the fact asserted above. The Court notes further that the summary judgment procedure involves the disputation of asserted facts, not the disputation of

requested that the fiancée be placed on administrative restriction so that she would not be housed at the Department of Correction.

64.     Plaintiff's fiancée was sentenced to 90 days in jail in full satisfaction of her probation term, which she spent at the Justice Center, and was released without further probation.

65.     Commissioner Cowin made the determination that Plaintiff would be served with a Notice of Charges with the penalty of termination.

66.     On September 17, 2015, Plaintiff was served with a Notice of Charges with the penalty of termination. The Notice of Charges specified three charges: (1) a charge that, during his medical leave, Plaintiff was specifically advised by Romeo not to engage in his secondary employment and Plaintiff assured Romeo that he would not, but that upon his return Plaintiff admitted that he had "had done some work" in his secondary employment during that medical leave; (2) a charge that Plaintiff had become involved in a personal relationship with a probationer and was engaged to be married but had failed to notify the Department of this relationship despite having worked for at least two weeks after learning of her probation status, and having been back to work without notifying the Department until he was questioned about it, and initially stating he did not notify the Department because he was out of work, then stating it was because he did not understand the policy; and (3) a charge that Plaintiff allowed his probationer fiancée to drive his vehicle despite being aware that she did not possess a valid driver's license.[35]

---

implied facts.  *See Yetman*, 2015 WL 4508362, at *10 (citing authorities).

[35]     Although he denies this fact, Plaintiff does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

67.     Plaintiff returned to work after receiving the Notice of Charges.

68.     Thereafter the Department was served with Plaintif's Grievance Form dated September 17, 2015.

69.     On September 23, 2015, a Step Two hearing was held with Employee Relations Officer Cifaratta. Following the hearing, Plaintiff was suspended without pay and escorted from the building.[36]

70.     By Notice of Step Two Decision dated October 7, 2015, Cifaratta upheld the Notice of Charges and the penalty of termination. Cifaratta found that it would have been reasonable for Plaintiff to report his relationship with the probationer before he returned to work from his medical leave, and that to the extent he argued that he did not understand the policies of the Department of Correction, he could have asked for clarification. It was Cifaratta's opinion that Plaintiff was not taking responsibility for his own conduct, and that he did not care enough to understand or follow the Department's policies.

71.     At no time during the course of the September 23, 2015, Step Two hearing did Plaintiff make any statements alleging he was being discriminated against or harassed by anyone because of his race or for any other reason.

72.     By letter dated October 13, 2015, Commissioner Cowin advised Plaintiff that, based on the Notice of Step Two Decision, Plaintiff was terminated effective September 23, 2015.

---

[36]     Although he denies this fact, Plaintiff does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute. Again, the Court notes that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts. *See Yetman*, 2015 WL 4508362, at *10 (citing authorities).

73.     On March 8, 2016, William J. Hanna, III, was appointed Commissioner of the Department of Correction.

74.     Plaintiff is not the only Department of Correction employee to have been disciplined for a violation of the Socialization Directive for failing to report a contact or relationship to the Department. Pursuant to the Socialization Directive, each case of contact reported to the Department pursuant to the Socialization Directive is reviewed on a case-by-case basis.

75.     Since Plaintiff's initial hiring date in September 2009, there have been three other officers who, at least in part, violated the socialization policy. In 2010, a Caucasian female voluntarily resigned during an investigation into her residing with a former inmate and allegations that her relationship with that former inmate began while she was still an inmate. Although the officer tried to rescind her resignation, the request to rescind was denied and the resignation remained in effect. In 2011, a Middle-Eastern male was investigated for numerous criminal charges, as well as violations of Department of Correction Directives and County Work Rules, including having an inappropriate relationship with an inmate and the inmate's family. When questioned by law enforcement concerning his alleged conduct, he submitted his resignation to the Department. In 2014, a Caucasian male was served with a Notice of Charges for several violations of Department and County policy, including excessive absenteeism, failure to verify sick leave, knowingly associating with a parolee without advising the Department, and failing to report a police contact which occurred while he was associating with the parolee. The Department of Correction assessed a penalty of immediate discharge from employment. During the grievance procedure, the officer came to a Last Chance Agreement with Employee Relations

Officer Cifaratta which reduced his termination to a 20-day working unpaid suspension and a three- year special evaluation period under certain terms, which if violated would result in his immediate termination. The Department is not aware of any other violations of the Socialization Directive during the time period since Plaintiff became a permanent employee.

76.     In addition to the three officers who have been charged with violations of the Socialization policy since Plaintiff became an employee, several other officers have been disciplined for violations of the Socialization Directive. In 2002, an African-American female received a 30-day unpaid suspension for residing with a former inmate. A Step Two Decision reduced the penalty to one month (20 working days) unpaid suspension which was upheld by an Arbitrator. Also in 2002, an African-American female was discharged from employment with the Department for residing with a parolee. A Step Two Decision upheld the termination from employment, and the officer came to a settlement agreement with the Department, in lieu of arbitration, in which she resigned and retired from the Department. Additionally, in 2002, a Caucasian male received the penalty of termination for associating with a former female inmate within days of her release from the Department. After being terminated, the officer resigned his position. In 2004, a Caucasian male received the penalty of termination for engaging in a personal relationship with a female inmate during the time she was incarcerated as well as after she was released. As the result of an arbitration decision, the officer was reinstated to his position, but was required to submit quarterly documentation of treatment for a condition the Arbitrator found may have led to the officer's conduct. In 2005, a Hispanic female reached a Settlement Agreement in which she resigned from her position as a result of charges involving a violation of the Socialization Directive. Finally, in 2006, a Caucasian male was assessed the

penalty of a 10-working-day suspension without pay for engaging in telephone contact with a former female inmate.

77.     Plaintiff admits that his belief that no one has ever been fired for violating the socialization policy is based on facility gossip.

<u>The First Reinstatement</u>

78.     Plaintiff sought an arbitration of his termination, and on June 7, 2016, and June 27, 2016, an Arbitration hearing was held regarding Plaintiff's charges and termination. By Opinion and Award dated August 5, 2016, the Arbitrator found that Plaintiff had engaged in the conduct in Specification 1 concerning the alleged violation of the Secondary Employment Directive, but that the alleged conduct did not constitute misconduct. The Arbitrator found that Plaintiff had engaged in the conduct in Specification 2 concerning the alleged violation of the Socialization Directive and certain County Work Rules, and that the alleged conduct constituted misconduct. However, the Arbitrator determined that the penalty of termination was not appropriate. Instead, the Arbitrator determined that the appropriate penalty would be a suspension without pay, with reinstatement without back pay within 15 days of the date of the Award. Finally, the Arbitrator determined that Plaintiff had not engaged in the conduct alleged in Specification 3 concerning knowingly allowing the probationer to drive his vehicle without a valid license.[37]

79.     Plaintiff returned to work at the Department of Correction within the fifteen days

---

[37]     Although he partially denies this fact, Plaintiff does not support that partial denial with a record citation. Nor can the Court find a citation to such a partial denial in Plaintiff's Statement of Additional Facts in Dispute. Again, the Court notes that summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts. *See Yetman*, 2015 WL 4508362, at *10 (citing authorities).

allotted by the Arbitrator, in August 2016, although he did not have the same days off as before his termination.

80. Other officers had days off changed during Plaintiff's absence (although Plaintiff claims those changes were under circumstances different from those of Plaintiff); and it is not unusual to have shifts changed or pass days changed.[38]

81. Plaintiff was served with a Counseling Memorandum dated December 10, 2016, for excessive absenteeism. Plaintiff refused to sign the memorandum because he claimed one of the dates was incorrect and he had taken that day as a vacation. By memo dated December 12, 2016, Romeo presented Plaintiff with his Request for Leave form that he had submitted seeking to use sick leave for the day in question.[39]

82. It is not uncommon for Department of Correction employees to refuse to sign Counseling Memoranda, and the failure to sign is not a disciplinary issue.

83. Thereafter, Romeo questioned the Watch Commander who had signed the Leave form. The Watch Commander advised that, although she did sign the Leave form stating it was sick leave, she believed it should have been for vacation leave. As a result, Romeo removed the one date in question from the Counseling Memorandum.

---

[38] Although he denies this fact, Plaintiff does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute. Again, the Court notes that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts. *See Yetman*, 2015 WL 4508362, at *10 (citing authorities).

[39] Although he denies this fact, Plaintiff does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute. Again, the Court notes that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts. *See Yetman*, 2015 WL 4508362, at *10 (citing authorities).

84.     On December 13, 2016, there was a discrepancy with the facility inmate count

that is required to be performed at the end of each shift. More specifically, the discrepancy

occurred with regard to the count required to be performed during the shift change from B-Watch

to C-Watch at 3:30 p.m. in Unit 9. After an investigation, the Department issued a memorandum

stating, in part, "It was determined that the problem was with the count entered by the B watch

Unit 9 officer. At approximately [3:27 pm.], CO Stamm entered Unit 9 and relieved CO Cooper,

therefore Stamm was the B watch officer responsible for conducting the [3:30 p.m.] count for

Unit 9." The inmate count was finally verified at 3:52 p.m.[40]

85.     Plaintiff describes the procedure of doing an inmate count as walking around a

housing unit counting each inmate individually and then logging the count in an electronic

logbook.[41]

86.     On December 13, 2016, Plaintiff relieved another officer in Unit 9, an

open-dormitory style unit with 45 bunks. The officer Plaintiff was relieving advised Plaintiff that

she had been working on four inmates' "blue cards" (which describe the inmates' housing

---

[40]     The Court has amended Paragraph 84 of Defendant's Rule 7.1 to more reflect the
portion of the record cited. (Dkt. No. 14, Attach. 3, at ¶ 49 [Romeo Aff.]; Dkt. No. 14, Attach.
49, at 2 [attaching Dept. memo dated Dec. 19, 2016].) Although Plaintiff denies the fact asserted
by Defendants, he does not support that denial with a record citation. Nor can the Court find a
citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute. While Plaintiff
disagrees that he was the sole officer responsible for the count because CO Cooper was also
responsible, that disagreement in no way controverts the above-stated fact, which regards what
the Department concluded.

[41]     The Court has amended Paragraph 85 of Defendant's Rule 7.1 to more reflect the
portion of the record cited. (Dkt. No. 14, Attach. 7, at 121-2s [attaching pages "120" and "121"
of Plf.'s Depo. Tr.].) Although Plaintiff denies the fact asserted by Defendants, he does not
support that denial with a record citation. Nor can the Court find a citation to such a denial in
Plaintiff's Statement of Additional Facts in Dispute.

conditions) and that she had not finished. Plaintiff advised that he would finish them for her, and the officer left the unit. No one had done a count.[42]

87.     While Plaintiff was completing the relieved officer's task, he walked through the unit and took a count, including contacting visitation to determine how many of the Unit 9 inmates were at visitation.

88.     Plaintiff continued attempting to finish the relieved officer's task, and two more officers, one being a trainee, entered the unit to relieve Plaintiff.

89.     Plaintiff directed the incoming officers to go ahead and do the count while he was completing the blue card work that he had assumed from the relieved officer.[43]

90.     Plaintiff admits that, if an officer is relieving another officer, and a formal count is required, then both officers are supposed to count.

91.     After doing a walk-through count, the trainee officer gave his count to Plaintiff who stated it was not the correct number. Thereafter, Plaintiff conducted a walk-through count with the other two officers and came up with the same incorrect number.[44]

---

[42]     The Court has amended Paragraph 86 of Defendant's Rule 7.1 to more reflect the portion of the record cited. (Dkt. No. 14, Attach. 7, at 123-26 [attaching pages "122" to "125" of Plf.'s Depo. Tr.].) Although Plaintiff denies the fact asserted by Defendants, he does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

[43]     The Court has amended Paragraph 89 of Defendant's Rule 7.1 to more reflect the portion of the record cited. (Dkt. No. 14, Attach. 7, at 126-27 [attaching pages "125" and "126" of Plf.'s Depo. Tr.].) Although Plaintiff denies the fact asserted by Defendants, he does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

[44]     Although Plaintiff denies the fact asserted by Defendants, he does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

92.     Eventually two more officers joined them, and over the course of 20 minutes and 12-13 counts, the five officers, including Plaintiff, finally came to the correct count.

93.     Upon leaving the unit, Plaintiff blamed the officer whom he had relieved for the confusion regarding the count, and advised the oncoming officers to review that officer's work before letting the inmates out of lock-in.

94.     Plaintiff went to the Watch Commander's Officer and advised Sgt. Moltz that the officer he had relieved had caused the wrong count in Unit 9 due to things she had done earlier that day.[45]

95.     Sgt. Moltz advised Plaintiff that he would talk to the Watch Commander and let Plaintiff know if he needed to write a report.

96.     Plaintiff then entered staff dining and continued venting to another officer about what happened when Sgt. Brinson entered and asked Plaintiff who did the count with him.

97.     Plaintiff admits that he was still venting when he responded to Sgt. Brinson in a loud voice, "Listen, if I have to write a report for this, I'm going--Cooper's--I'm going to throw Cooper under the bus. I just came back from something, and I'm not going to get penalized for, and the count was all fucked up."[46]

---

[45]     The Court has amended Paragraph 94 of Defendant's Rule 7.1 to more reflect the portion of the record cited. (Dkt. No. 14, Attach. 7, at 129-30 [attaching pages "128" and "129" of Plf.'s Depo. Tr.].) Although Plaintiff denies the fact asserted by Defendants, he does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

[46]     The Court has amended Paragraph 97 of Defendant's Rule 7.1 to more reflect the portion of the record cited. (*See, e.g.,* Dkt. No. 14, Attach. 7, at 130-31 [attaching pages "129" and "130" of Plf.'s Depo. Tr.].) Although Plaintiff denies the fact asserted by Defendants, he does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

98.     Plaintiff admits that he was heated during the exchange, that he was talking loudly, that he was talking with his hands, and that he used the term "fucked up" and other such language while talking to Sgt. Brinson.

99.     Plaintiff admits that another officer intervened, told Plaintiff that it was not the right place and went with Plaintiff to the men's locker room.

100.    Plaintiff admits that he was yelling or talking loudly in the locker room with the other officer present, but that he did not yell directly at Sgt. Brinson.

101.    Sgt. Brinson reported the incident to her supervisor, and Plaintiff was thereafter escorted to Assistant Commissioner Heisler's office where he was informed that there was going to be an investigation, and then he was escorted to the front door of the building.[47]

102.    Because Plaintiff had already worked a full shift on December 13, 2016, he was given no additional leave for that day. Plaintiff was placed on paid Administrative Leave, which was leave with pay, beginning on December 14, 2016.

103.    The entire incident on December 13, 2016, was thereafter referred to Internal Affairs Lt. Kearney for investigation. Lt. Kearney and Sgt. Brinson interviewed several witnesses to both the inmate count issue and the incident; and Lt. Washington reviewed the video tape of the inmate count.

104.    The video of Unit 9 and log entries indicated that Plaintiff took an inmate count at 3:30 p.m. but failed to enter the count into the log. When the officers relieving Plaintiff entered the unit, Plaintiff was on the phone, and did not join in the inmate count with them as required by

---

[47]     Although Plaintiff denies the fact asserted by Defendants, he does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

the Inmate Count Directive. The video further showed that Plaintiff joined the other officers for some of the recounts, but not all, which was also in violation of the policy. Witnesses to the incident with Sgt. Brinson also provided statements confirming Sgt. Brinson's question to Plaintiff, and Plaintiff's behavior and responses to Sgt. Brinson. At one point during the exchange, Sgt. Brinson advised Plaintiff that she would need a report because of his behavior, to which Plaintiff replied, "No, no, I'm gonna need a fucking report." Lt. Kearney then submitted a report, statement and records to Commissioner Hanna, by memo dated December 19, 2016.[48]

105.    The matter was reviewed by PAC, which (given Plaintiff's insubordinate behavior towards Sgt. Brinson) made the recommendation of Notice of Charges with a penalty of termination to Commissioner Hanna. Violations of the Inmate Count Directive have in the past resulted, and currently still do result, in disciplinary proceedings. However, Plaintiff's violation of the Inmate County Directive was not the basis for the recommendation of his termination. Rather, the termination recommendation was made based upon Plaintiff's unprovoked insubordinate behavior towards Sgt. Brinson, and his disciplinary history. Because the two incidents had occurred on the same date and were related, the recommendation was to include both charges in the Notice of Charges.

106.    Thereafter, Commissioner Hanna made the determination to serve Plaintiff with a Notice of Charges with the penalty of termination.

107.    On December 20, 2016, Plaintiff was served with the Notice of Charges with the penalty of immediate discharge for the incidents on December 13, 2016. The Notice of Charges

---

[48]    Although Plaintiff denies the fact asserted by Defendants, he does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

specified two charges: one charge of failing to follow the policies and procedures for counting inmates, and one charge of insubordination to Sgt. Brinson. The Notice of Charges listed several Department policies and County Work Rules which were violated. Plaintiff was then immediately suspended without pay.

108.    On December 21, 2016, the Department received Plaintiff's Grievance Form regarding the Notice of Charges and sanctions imposed on December 20, 2016.

109.    On December 23, 2016, Employee Relations Officer Cifaratta conducted a Step Two hearing. During the hearing Plaintiff offered an explanation as to the reasons for the late count and his failure to conduct the count according to the Departmental policy. In response to the allegations concerning the Supervisor's question, Plaintiff alleged that the Sergeant was being inappropriate. Plaintiff's comments regarding the Sergeant's behavior were not supported by the witness statements.[49]

110.    During the hearing of December 23, 2016, while offering an explanation of the events of the day in question, Plaintiff stated that his co-workers were picking on him because of the late count, making comments the nature of which were that, because of his late count, others had to stay late.

111.    Plaintiff admits that the comments being made by his co-workers regarding the late count were done in the nature of hazing.

112.    Cifaratta responded to Plaintiff's statements about his co-workers hazing him for the late count by saying, "Come on, you're a big guy, you can handle it," and by saying that his

_____

[49]    Although Plaintiff denies the fact asserted by Defendants, he does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

co-workers picking on him for the late count should not ruin his day.

113.    At no time during the course of the Step Two Hearing of September 23, 2015, did Plaintiff ever state that he was being picked on because of his race, or that he was being subjected to racial discrimination or harassment. Plaintiff's race was never raised, in any manner, during this Step Two hearing.[50]

114.    If Plaintiff had made any allegations concerning racial discrimination or harassment, Cifaratta would have taken the appropriate steps and conducted an investigation into those allegations.[51]

115.    By Notice of Step Two Decision dated December 23, 2016, Cifaratta upheld the decision to terminate. Cifaratta's decision was based on his opinion that an officer of Plaintiff's length of service knows that incoming and outgoing staff conduct the inmate count together, and that Plaintiff failed to do that at least three times during the repeated inmate counts on the date in question. However, Cifaratta found that his failure to properly conduct the inmate counts, alone, would not be sufficient to impose the sanction of termination. In Cifaratta's further opinion, Plaintiff's inappropriate, disrespectful, argumentative and expletive-laced insubordinate behavior to the Sergeant had no place in a department that is a paramilitary organization, or in any other type of department. It was Plaintiff's insubordinate behavior taken together with his employment

---

[50]    Although Plaintiff denies the fact asserted by Defendants, he does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute. The Court notes that, although Plaintiff testified during his deposition that at the hearing Cifaratta made what Plaintiff perceived to be *sexually*-discriminatory comment, this testimony does not constitute evidence that Plaintiff's race was raised, in any manner, during this Step Two hearing. (Dkt. No. 14, Attach. 7, at 135 [attaching page "134" of Plf.'s Depo. Tr.].)

[51]    Although Plaintiff denies the fact asserted by Defendants, he does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement

history of failing to follow job instructions that resulted in Cifaratta's decision to uphold the Department's penalty of termination.

116.    Plaintiff was advised by letter dated December 27, 2016, from Commissioner Hanna that he was terminated from employment effective December 23, 2016.

<u>EEOC Complaint and Federal Court Action</u>

117.    In January 2017, on or prior to January 13, 2017, Plaintiff Kristopher Stamm filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission (hereinafter "EEOC") against the County alleging race and sex discrimination. By Notice of Charge of Discrimination dated January 13, 2017, the County was noticed that the Charge had been filed and that no action was required of the County. The County was never served with a copy of the EEOC Charge of Discrimination.

118.    On February 23, 2017, the EEOC issued a Dismissal and Notice of Rights letter. The EEOC letter specifically stated, in part, that, "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes."

119.    On May 24, 2017, Plaintiff filed a Complaint with a Jury Trial Demand in the United States District Court for the Northern District of New York pursuant to Title VII (hereinafter the "Complaint"). The Complaint named the County as the Defendant and alleged one cause of action for racial discrimination. Plaintiff seeks compensatory and punitive damages and injunctive relief.

120.    On June 15, 2017, the County filed an Answer to Complaint and Demand for Jury Trial.

of Additional Facts in Dispute.

<u>The Second Reinstatement</u>

121.    An arbitration hearing was held on June 29, 2017, November 6, 2017, December 4, 2017, and January 25, 2018. The Arbitrator issued an Opinion and Award dated March 27, 2018, finding Plaintiff guilty of only a portion of Specification 1 regarding the inmate count, and guilty of violating Department policy and County Work Rules in regard to his interactions with Sgt. Brinson. The Arbitrator found that substantial discipline was justified given Plaintiff's prior poor disciplinary history, and his disrespect and refusal of a directive from a superior officer which took place in front of other officers which cannot be tolerated as it undermines the respect for the chain of command in a paramilitary organization. However, the Arbitrator determined the penalty of termination was not appropriate, and determined the appropriate penalty would be a suspension without pay to the date of the Opinion and Award to be the appropriate discipline. Plaintiff was ordered re-instated to his position.[52]

122.    Romeo contacted Plaintiff by telephone on March 27, 2018, and told Plaintiff that he could return to work on C-Watch on March 28, 2018. Plaintiff advised that he was not able to return on that date, but that he could return on April 2, 2018. Romeo advised Plaintiff that he might have to use leave accruals to cover the days he was unable to work, and Plaintiff indicated he would prefer to use leave without pay, at which time Romeo explained that only the Commissioner (the Chief Deputy) had the authority to allow leave without pay. Plaintiff never submitted a written request for leave without pay, and his verbal request was denied.[53]

---

[52]    Although Plaintiff denies the fact asserted by Defendants, he does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

[53]    Although Plaintiff denies the fact asserted by Defendants, he does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement

123.     Because Plaintiff would not be returning to work when requested by the Department of Correction, three vacation days were used to cover the days until he advised he could return, and his pass days were changed from April 2 and 3 to March 31 and April 1 to cover the additional days until Plaintiff's return. The pass days were changed so that additional leave accruals would not have to be used.[54]

124.     On April 11, 2018, Plaintiff submitted a tri-form concerning the loss of a baseball jacket when he was terminated from employment in 2016. Plaintiff requested that the Department purchase him a new jacket or reimburse him the cost of the jacket. After a thorough and diligent search, such a jacket was not able to be located, nor was there any indication that Plaintiff had actually owned such a jacket. The matter is still pending.

125.     On April 12, 2018, Plaintiff submitted a Grievance Form regarding the use of vacation time to cover the days when he alleged he was unable to return to work, and also grieving his not being reinstated to the Response Team which he alleged was ordered per the Arbitrator's award.

126.     By memo dated April 12, 2018, Romeo advised Plaintiff that his grievance had been denied. Romeo reminded Plaintiff of the telephone conversation on March 27th and stated that the Arbitrator's award did not order his reinstatement to the Response Team. On April 18, 2018, the Department was served with a Grievance Form for a Step Two hearing. That matter is still pending.

of Additional Facts in Dispute.

[54]     Although Plaintiff denies the fact asserted by Defendants, he does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

127. Plaintiff admits that he is not aware of the Response Team policy's contents. Plaintiff further admits he is not aware that there is a Response Team Review Board, or that the Review Board reviews who should remain on the Response Team. Plaintiff also admits that he is not aware of whether the Review Board is reviewing his reinstatement to the Team.

128. Plaintiff filed an Onondaga County Employee Harassment and Discrimination Complaint Form with the Onondaga County Director of Employee Relations on or about April 14, 2018, regarding the Response Team issue and alleging harassment and retaliation. By email dated April 16, 2018, Employee Relations Director Chaplin advised Plaintiff that he was gathering information concerning his claims. The matter is still pending.

129. In late April 2018, Romeo was advised that the Union would be seeking clarification from the Arbitrator regarding the re-instatement to the Response Team issue. That matter is still pending.

130. On April 17, 2018, Plaintiff submitted a medical note indicating that he was not to work more than 12 hours in a given day. By memo dated April 27, 2018, Plaintiff submitted a memo indicating that he was ordered to work overtime on April 28, 2018, in excess of the 12-hour workday allowed by his medical provider, and that he was not declining overtime and was willing to work the hours allowed by his doctor.[55]

131. Plaintiff's medical excuse restricting him from working more than 12 hours in a day has been honored (with two minor exceptions). More specifically, Plaintiff has not worked more than 12 hours in a day since the receipt of the medical note with the exception of two days

---

[55] Although Plaintiff denies the fact asserted by Defendants, he does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

in which he worked 12.25 hours due to shift change overlap. If the Department needs someone

for 16 hours, they order the overtime, and it is then up to the officer to address any outstanding

restrictions they may have. Plaintiff has been ordered to work 16 hours since the note was

submitted, but Plaintiff has refused anything over the 12 hours. There have been no repercussions

to Plaintiff as a result of his 12-hour limitation.[56]

132.     All security staff members are informed prior to being hired that they may be

assigned to any shift or squad at any time depending upon the needs of the Department. On April

18, 2018, Plaintiff submitted a request for an emergency shift change. At least two other officers

also made emergency shift change requests within two weeks of Plaintiff's request. All three

requests were being reviewed by the Department when, on April 30, 2018, Plaintiff filed a

Complaint with New York State Division of Human Rights regarding the issue of the shift

change. Plaintiff alleged that he was being discriminated against because of his status as a single

father. The matter is still pending.[57]

### D.     Parties' Legal Arguments on Defendant's Motion

#### 1.     Defendant's Memorandum of Law

Generally, in support of its motion, Defendant asserts four arguments. (*See generally* Dkt.

No. 14, Attach. 69 [Def.'s Memo. of Law].) First, Defendant argues, Plaintiff's claims arising

from events occurring before March 9, 2016, are barred by the applicable 300-day limitations

---

[56]     Although Plaintiff denies the fact asserted by Defendants, he does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

[57]     Although Plaintiff denies the fact asserted by Defendants, he does not support that denial with a record citation. Nor can the Court find a citation to such a denial in Plaintiff's Statement of Additional Facts in Dispute.

period set forth by Title VII. (*Id*.) More specifically, Defendant argues, because the earliest that Plaintiff could have filed his EEOC complaint was January 3, 2017, only events that occurred within 300 days before that date (or on or after March 9, 2016) are actionable. (*Id*.) Moreover, Defendant argues, the only way that Plaintiff can introduce evidence of incidents that occurred before March 9, 2016, he must establish that those events and the timely events constitute a "continuing violation." (*Id*.) However, Defendant argues, he has failed to do this because there is neither a specific policy or practice that caused the alleged discrimination nor a timely claim that is continuous in time with the untimely claims. (*Id*.)

Second, Defendant argues, the Court lacks subject-matter jurisdiction over all claims other than those arising from events occurring between March 9, 2016, and January 3, 2017, because he failed to exhaust his available administrative remedies with regard to those other claims before filing suit. (*Id*.) More specifically, Defendant argues, in his EEOC complaint, Plaintiff failed to present a claim reasonably related to either his current hostile-work-environment claim or any claim arising from his September 2015 termination of employment. (*Id*.) Moreover, Defendant argues, to the extent that Plaintiff now wants to assert claims arising from events that occurred after his return to employment in April 2018, those claims are not yet ripe to be heard because (a) none of those claims can be found to be reasonably related to the claims presented in his January 2017 EEOC complaint, (b) he has not yet filed a post-April 2018 EEOC complaint regarding the majority of those claims, and (c) any such EEOC complaint is still pending. (*Id*.)

Third, Defendant argues, regardless of whether his race-discrimination claim is limited to events occurring between March 9, 2016, and January 3, 2017, Plaintiff cannot establish a

race-discrimination claim. (*Id*.) More specifically, Defendant argues, Plaintiff cannot establish the fourth element of such a claim (i.e., that that the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination), because the only "evidence" he can offer in support of such a claim is his own subjective belief that the adverse employment action he experienced was caused by his race. (*Id*.) Moreover, Defendant argues, even if Plaintiff can establish that element, Defendant has articulated a legitimate non-discrimination reason for the two unfavorable employment actions Plaintiff experienced: (1) he was terminated in September 2015 because (a) he had violated the Socialization Directive by engaging in a romantic relationship with a current probationer without reporting that fact, (b) he had violated the Secondary Employment Directive by working at least four hours per week in a secondary job while on medical leave, and (c) he had allowed his probationer fiancée to drive his vehicle to a probation appointment despite the fact that she did not possess a valid driver's license; and (2) he was terminated in December 2016 because, after he had been responsible for an inmate count that had been prolonged by 22 minutes because of a discrepancy, he had engaged in insubordinate behavior toward his supervisor (who had directed him to write a report about the incident), which behavior was exacerbated by his employment history of failing to follow job instructions. (*Id*.) Finally, Defendant argues that, contrary to Plaintiff's hearsay-based assertions, in fact, no non-Asian similarly situated individuals were treated differently than was Plaintiff. (*Id*.)

Fourth, Defendant argues, similarly, Plaintiff cannot establish either element of a hostile-work-environment claim. (*Id*.) More specifically, Defendant argues, Plaintiff cannot establish that the workplace was permeated with discriminatory intimidation that was sufficiently

severe or pervasive to alter the conditions of the workplace, because the actions he alleges (i.e., an incident involve a Sgt. Lee between 2012 and 2014, an incident involving writing on his truck in 2014, a comment by Assistant Commissioner Heisler during a 2015 hearing, comments by fellow officers regarding his late inmate count, a comment by Employment Relations Officer Cifaratta during a 2016 hearing, and racially disparaging comments made by fellow officers) were not severe or pervasive (and indeed were deemed by Plaintiff to in the spirit of "roasting" or hazing), nor were some of the actions even based on his race. (*Id.*) Moreover, Defendant argues, even if he could establish the above element, Plaintiff cannot establish that a specific basis exists for imputing the conduct that created the hostile environment to the employer, because (a) the alleged harassment by his co-employees was never known by, or reported to, his superiors, and (b) while the alleged harassment by his supervisors creates a presumption of liability on the part of Defendant, that presumption can be, and has been, rebutted through evidence that Defendant exercised reasonable care to prevent and promptly correct such harassment (through maintaining policies prohibiting it), and Plaintiff unreasonably failed to avail himself of any corrective or preventative opportunities provided. (*Id.*)

**2.     Plaintiff's Opposition Memorandum of Law**

Generally, in response to Defendant's motion, Plaintiff asserts two arguments. (*See generally* Dkt. No. 20 [Plf.'s Opp'n Memo. of Law].) First, Plaintiff argues, because he has shown through his affidavit and exhibits that there exist several genuine disputes of material fact, Defendant's motion should be denied. (*Id.*)

Second, Plaintiff argues, he has established a prima facie case of both race-based and gender-based discrimination. (*Id.*) More specifically, Plaintiff argues, he has adduced admissible

record evidence (i.e., his own deposition testimony and the deposition testimony of Officer Emm) that his September 2015 termination was caused by his race. (*Id*.) In addition, he argues, he has adduced admissible record evidence (i.e., his own deposition testimony and the deposition testimony of Officer Tineo) that his December 2016 termination was caused by his race. (*Id*.) Finally, he argues, he has adduced admissible record evidence (i.e., his own deposition testimony, his own sworn statements, photographs of graffiti on his car, a cleaning invoice, an admission by Officer Emm, the deposition of Officer Emm and the deposition of Officer Tineo) that he was subjected to a hostile work environment based on both his race and gender. (*Id*.)

### 3. Defendant's Reply Memorandum of Law

Generally, in reply to the Plaintiff's response, Defendant asserts two arguments. (*See generally* Dkt. No. 21, Attach. 1 [Def.'s Reply Memo. of Law].) First, Defendant argues, the factual assertions in Plaintiff's opposition papers are wholly conclusory in nature because they rely on nothing more than citations to (a) inadmissible hearsay evidence, (b) inapposite portions of the record, (c) sworn statements based on a lack of personal knowledge, (d) unsworn allegations, (e) challenges to the veracity of sworn witnesses, and/or (f) his own self-serving affidavit which improperly contradicts his prior deposition testimony. (*Id*.)

Second, Defendant argues, Plaintiff's Response to Defendant's Statement of Material Facts should be disregarded because it improperly contains only gratuitous argument and no required record citations. (*Id*.)

## II. GOVERNING LEGAL STANDARDS

### A. Legal Standard Governing Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[58] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[59]

---

[58]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].   As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[59]     *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[60]

### B. Legal Standards Governing Plaintiff's Claims

### 1. Plaintiff's Title VII Claim of Race Discrimination

A race-discrimination claim under Title VII is analyzed under the three-step burden-shifting standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

As to the first step of this analysis, "[the plaintiff] bears the burden of establishing a prima facie case of discrimination by showing [the following:] (1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse

---

[60] Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Tolbert v. Smith*, 790 F.3d 427, 435 (2d Cir. 2015) (internal quotation marks omitted).

If the plaintiff can prove all four elements, then the second step is triggered, which shifts the burden of production to the defendant to come forward with a legitimate, non-discriminatory reason for the challenged employment action. *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) ("A plaintiff's establishment of a prima facie case gives rise to a presumption of unlawful discrimination that shifts the burden of production to the defendant, who must proffer a legitimate, non-discriminatory reason for the challenged employment action.").

If the defendant comes forward with such a reason, then presumption of discrimination drops out of the analysis, and the second step is triggered, which shifts the burden back to the plaintiff to show, "without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). More specifically, the plaintiff must demonstrate "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). As explained by the Supreme Court, to demonstrate pretext, a plaintiff must show "both that the [employer's offered] reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *see also Fisher v. Vassar Coll.*, 70 F.3d 1420, 1433 (2d Cir. 1995).

### 2.    Plaintiff's Title VII Hostile-Work-Environment Claim

To establish a hostile work environment claim under Title VII, a plaintiff must show two

things: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment; and (2) that there exists a

specific basis for imputing the conduct creating the hostile work environment to the employer.

*Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002). In this regard, the test may be described as

having both "objective and subjective elements: the misconduct shown must be 'severe or

pervasive enough to create an objectively hostile or abusive work environment,' and the victim

must also subjectively perceive that environment to be abusive." *Alfano*, 294 F. 3d at 373

(quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 [1993].)

In determining whether the first requirement has been met, a court should look at the

totality of the circumstances. *Alfano*, 294 F.3d at 374. Factors that courts should examine include

"the frequency of the discriminatory conduct, its severity, whether it is physically threatening or

humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an

employee's work performance." *Harris*, 510 U.S. at 23. "Isolated acts, unless very serious, do not

meet the threshold of severity or pervasiveness." *Alfano*, 294 F.3d at 374; *see also Faragher v.

City of Boca Raton*, 524 U.S. 775, 788 (1998) ("We have made it clear that conduct must be

extreme to amount to a change in the terms and conditions of employment.").

In determining whether the second requirement has been met, a court should remember

that, "if a plaintiff's supervisor is the alleged harasser, an employer will be liable if the supervisor

uses his actual or apparent authority to further the harassment, or if the supervisor was otherwise

aided in accomplishing the harassment by the existence of the agency relationship." *Tomka v.

Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995), *abrogated on other grounds by Burlington

Indus., Inc. v. Ellerth*, 118 S. Ct. 2257 (1998), and *Faragher v. City of Boca Raton*, 118 S. Ct.

2275 (1998). "By contrast, where a low-level supervisor does not rely on his supervisory authority to carry out the harassment, or a co-employee of the plaintiff is the alleged harasser, an employer will generally not be liable unless the employer either [1] provided no reasonable avenue of complaint or [2] knew of the harassment but did nothing about it." *Tomka*, 66 F.3d at 1305.

With regard to the requirement that the employer provide a reasonable avenue of complaint, an employer that has a harassment policy provides a reasonable avenue for complaint. *See Torres v. Pisano*, 116 F.3d 625, 636 (2d Cir. 1997) ("As the district court correctly explained, Torres cannot impute liability to NYU on the ground that it did not provide a reasonable opportunity to complain: 'Torres does not seem to dispute that NYU provided a reasonable avenue for complaint. She knew about NYU's written sexual harassment policy, but did not file a complaint with any of the people designated to receive them.'"); *Scoppettone v. Mamma Lombardi's Pizzico, Inc.*, 523 F. App'x 73, 75 (2d Cir. 2013) ("We agree with the district court that Mamma Lombardi's provided a reasonable avenue for complaint: it had in place a sexual-harassment policy indicating that an employee could speak to his or her supervisor, the human resources manager, or the owner."); *cf. Brabson v. The Friendship House of W. N.Y.*, 46 F. App'x 14, 17-18 (2d Cir. 2002) ("Here, the evidence adduced clearly proved that Friendship House failed to provide a reasonable avenue for complaint. Friendship House had no sexual harassment policy at the time of the incidents.").

With regard to the requirement that the employer do something about harassment of which it has knowledge, the essence of this requirement is the reasonableness of the employer's response to the plaintiff's complaints. *Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir.1986)

("[W]e hold today that once an employer has knowledge of a racially combative atmosphere in the workplace, he has a duty to take reasonable steps to eliminate it."). As for whether a response is "reasonable," this assessment must be made from "the totality of circumstances." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998). "Factors to be considered in this analysis are the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment." *Distasio*, 157 F.3d at 65. Other factors may include (1) the amount of time that elapsed between the notice and remedial action, (2) whether the response taken comported with the employer's policies, (3) whether the co-employees complained of were confronted and reprimanded, and (4) whether the response ended the harassment. *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 153-54 (2d Cir. 1997); *Finnerty v. William H. Sadlier, Inc.*, 176 F. App'x 158, 162 (2d Cir. 2006).

## III. ANALYSIS

After carefully considering the matter, the Court grants Defendant's motion for the reasons stated in its memoranda of law. *See, supra,* Parts I.D.1. and I.D.3. of this Decision and Order. To those numerous reasons, the Court adds only two points, which are intended to supplement and not supplant those reasons.

First, by failing to oppose Defendant's first two arguments (i.e., those based on the statute of limitations and failure to exhaust), Plaintiff has lightened Defendant's burden with regard to those arguments such that, in order for the arguments to succeed, they need possess only facial merit. This is because, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local

Rule 7.1(b)(3).[61] Stated another way, when a non-movant willfully fails to oppose a legal

argument asserted by a movant, the movant may succeed on the argument by showing that the

argument possess facial merit, which has appropriately been characterized as a "modest" burden.

*See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court

determined that the moving party has met its burden to demonstrate entitlement to the relief

requested therein, the non-moving party's failure to file or serve any papers as this Rule requires

shall be deemed as consent to the granting . . . of the motion, as the case may be, unless good

cause is shown."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y.

Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009

WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

      Here, the Court finds that Plaintiff's failure was willful because, at the time he filed his

response (and, indeed, at all times), he was proceeding by counsel, who (in order to be admitted)

certified that he read and understands the Court's Local Rules of Practice. Moreover, the Court

finds that the above-referenced two arguments possess, at the very least, facial merit for the

reasons stated therein: they employ the correct standards and reasonably apply the law to the

facts. The Court notes that Defendant is correct that Plaintiff has not shown that the

continuing-violation doctrine applies in this case. *See Quinn v. Green Tree Credit Corp.*, 159

F.3d 759, 766 (2d Cir. 1998) ("[A] continuing violation may be found where there is proof of

---

[61]    *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31
(N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to
oppose several arguments by defendants in their motion for summary judgment as consent by
plaintiff to the granting of summary judgment for defendants with regard to the claims that the
arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*,
02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming
plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a

specific ongoing discriminatory polices or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.") (internal quotation marks omitted), *abrogated in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). As a result, the only claims before the Court are those claims arising from events occurring between March 9, 2016, and January 3, 2017.

Second, Plaintiff has failed to create a genuine dispute of material fact with regard to either of his remaining claims arising from events occurring between March 9, 2016, and January 3, 2017 (and indeed with regard to any of his barred claims). With regard to his race-discrimination claim arising from his termination in December of 2016, Plaintiff's response ignores the uncontroverted evidence that he was terminated not for bungling an inmate count but for (1) engaging in insubordinate behavior toward his supervisor following that count, and (2) failing to follow jobs instructions at various times before then. When one considers those undisputed facts, one cannot rationally conclude, based on the current record, that there existed any non-Asian similarly situated individuals who were treated more favorably than was Plaintiff.

Finally, with regard to Plaintiff's hostile-work-environment claim arising from events occurring between March 9, 2016, and January 3, 2017, Plaintiff's response ignores the uncontroverted evidence that the only asserted harassment that he experienced during that time consisted of the following: (1) his receiving disparaging comments (in the form of "hazing") from fellow officers regarding his apparent responsibility for a late inmate count; (2) his receiving a callous comment about his size/age by Employment Relations Officer Cifaratta

concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

during a subsequent Step-Two hearing; (3) *perhaps* during the time in question (although this is not clear) his being "roast[ed]," like everyone else, in the "staff dining" area; and (4) *perhaps* during the time in question (although this is far from clear) his Asian heritage being remarked upon by some people during Plaintiff's and Officer Tineo's mutual racial banter in the break room. The first three such instances cannot rationally be found to have been based on Plaintiff's race. Moreover, the fourth instance cannot rationally be found to be severe or pervasive. In any event, no grounds exist to impute this conduct to Defendant, especially given the existence of its harassment policies and Plaintiff's failure to subsequently avail himself of the policies' reasonable avenue for complaint.

For all of these reasons, Defendant's motion is granted.

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 14) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **<u>DISMISSED</u>**; and it is further

**ORDERED** that the Clerk of the Court shall issue a Judgment for Defendant and close this action.

Dated: March 1, 2019
      Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge